Good morning, Your Honor. I am Thomas Lenz, counsel for Petitioner RECON, and present with me are Dan Bellamy of RECON and Scott Doucher, who assisted on the briefs. We're here to talk about a case involving the National Labor Relations Board and an employer stuck in a dispute between two unions. RECON established itself in 1990 and signed up with the Bricklayers. In 1995, RECON signed a contract with the IPTW union, represented by Mr. Rosen. RECON used employees from both unions. And in 1999, RECON had to decide how it was going to move into the future. It faced negotiations with the Bricklayers for a new contract. The negotiations failed. In mid-November 1999, the contract expired. There was a hiatus of over one month before RECON signed a contract again with the Bricklayers. RECON had foreshadowed to the Bricklayers that it would assign unskilled work, either non-union or to another union, if it did not reach a contract that would make it competitive. It sought economic relief. That was denied. RECON did try to rescind its termination notice after the contract expired in November, and the Bricklayers denied that. Although RECON did sign a contract with the Bricklayers in late December, the IPTW had begun doing the work that is now in dispute. This led to grievances from the Bricklayers, a lawsuit claiming breach of contract, which is pending in the central district and awaiting the outcome of this ruling, and RECON began to receive complaints about the IPTW doing the work. The RECON, as well as the Bricklayers, filed charges with the National Labor Relations Board because the IPTW threatened to picket and engage in economic action if, as a result of the Bricklayers' lawsuit, RECON were to assign IPTW's work to the Bricklayers. An 18-day hearing before the National Labor Relations Board took place, generating a huge record. In 2003, after all of this litigation, the NLRB quashed the notice of hearing. It's RECON's position that the quashing of the notice of 10-K hearing is arbitrary and capricious. The case should be remanded for a Section 10-K award to resolve the dispute between the two unions. What is really important here, and what is completely absent from the NLRB's analysis, is the rules affecting the construction industry. RECON, as a construction industry contractor, is allowed to enter into collective bargaining agreements under Section 8F of the National Labor Relations Act. This is distinct from other industries. There is no proof of majority support from employees required. And when that contract expires, RECON is free to walk away. The Board has issued a ruling in the 80s called John Declan and Sons, which is really the guiding principle on this. And in 2003, there was a case in the D.C. Circuit, Nova Plumbing, which very specifically ruled on this, and I think provides guidance here. What is crucial is that there was a hiatus between mid-November and the time RECON signed a contract in late December. Why is that so crucial? Because RECON had to assign work to serve its contracts, to serve its customers. Well, when they – but later on, when they re-signed the contract, was there anything unique about that re-signing as opposed to prior contracts that accounted for this hiatus? The bricklayers failed to provide the relief in the negotiations before expiration. And when RECON assigned the work to the IPTW, then re-signed with the bricklayers, this was a situation where the bricklayers had to take the situation as they found it. Why is that? And what case do you point to that supports that? The difference between – Do you have a case that supports that statement? Nova Plumbing is a case I would suggest you look at from the D.C. Circuit. The issue being, unlike industries other than construction, where you have a bargaining duty after expiration under Section 9A of the National Labor Relations Act, the contract expires in the construction industry under 8F. Duties are gone. And what – But I don't understand. The new contract had the same work clause, the same paragraph, right? That defined what – The coverage language is substantially similar, if not identical. Yes. It's the same. You can answer that yes. Yes. So what difference does the month break? You signed the same contract with them. When we got to November 14, 1999, there was no longer a relationship between Recon and the bricklayers. This was confirmed in writing. The bricklayers sent a letter to Recon to that effect and also picketed. And they – the parties had nothing between them. So all the historical relationship between the parties is just now gone. I'm not saying it's – It's just vitiated. It doesn't even count for anything. It's gone. It's not gone, but it's certainly not dispositive. The construction industry nature of the work, the Section 8F of the National Labor Relations Act, which the Board ignored, really provides guidance here. The Board was actually in NOVA plumbing, ignoring the impact of Section 8F in a representational dispute in NOVA, and the Court properly called upon the Board to acknowledge Section 8F's existence. And this is discussed in a reply brief as well. Now, the bricklayers who filed a charge claiming that there was an unlawful threat are now on the other side of the table, and they, as well as the Board and the ruling, try to insinuate that there was something sinister about what Recon did in reassigning the work. Now, the Board has issued a number of Section 10K rulings, and those are viewable as CD charges. They're called CD charges on the Board's website, nlrb.gov. But since the Recon decision, and I would point you specifically to one in December involving the bricklayers and a contractor called Cretex. And in that case ---- Is that in your brief? It came out after the brief, Your Honor. Did you submit a 28-J letter? No, I did not. Well, perhaps you could write down the citation. Ordinarily, we wouldn't even need it. I can give it to you right now. Well, that's not going to help. You need to do it properly. Okay. Thank you. Regardless, the Board's ruling in this case is premised on an idea that there was some sort of work preservation, which insinuates that there was a duty between the time Recon's contract expired and the time Recon signed a new one with the bricklayers. Under Section 8F, John Deca-Winson's, that is not the case. I mean, your whole argument, then, is predicated on this 30-day hiatus. Is that right? That is an argument ---- I mean, that's it. I mean, if I don't ---- if I'm not persuaded by that argument, then I gather you would say the Board's decision should be affirmed. Right? Do you point to any other errors in the Board's decision? We pointed out the factual errors. But we are of the belief that if the factual errors that the Board made are resolved one way or the other, they don't affect the result, because the work preservation defense that the bricklayers are asserting that the Board relied on doesn't apply. In this case, the IPTW was the one that uttered the threat. And the work preservation defense only applies to the union that pickets or utters the threat. So it's completely inapplicable here. And the cases that the Board relied on, the Safeway case from the Board as well as the Wesco case, are completely distinguishable. You had in the Wesco case from this circuit a subcontract. There was no subcontract here. And in the Safeway case from the Board, you had an issue of an employer that had basically no competing claims to the work between the two unions. They're very distinguishable cases. Here, there is reasonable cause to proceed under the National Labor Relations Act, Section 10K. The Supreme Court has commanded the Board to they've empowered and directed the Board to resolve these disputes when presented under Section 10K, provided that there is operative Section 8B4D conduct, either a threat or picketing. There are competing claims, which we have here, and there are no alternative means to resolve the dispute. There is no privity between all parties to provide alternative means to resolve this dispute. This is an opportunity for the Court to harmonize Section 8F in the construction industry and Section 10K, because the realities of the construction industry, the need to assign work and the right to walk away from a contract when it expires, are not at all recognized here. And unless the Court has any further questions. I'm just still puzzled. I mean, the contract expired, but you didn't really walk away from it. You renewed it the next month. That's true, but that was an independent decision made without a duty to the bricklayers. You gave me a case earlier on that said, a case that supported your position. What was that case? On Section 8F? Just back up. I asked you whether you had a case that supported what you just said right now in answering Judge Wardlaw's question. Yes. What was that case again? Nova Plumbing v. NLRB from the D.C. Circuit in 2003. Nova Plumbing. And also John Deklawas and Sons. Was that cited in your brief? Yes, they're cited in the reply brief. Nova Plumbing. Okay. From the D.C. Circuit. That's correct. Okay. And if you have no further questions. Okay. Thank you. Thank you, Counsel. Good morning, Your Honor. May it please the Court. I'm Howard Rosen on behalf of IPTW, the intervener. The Board's analysis is just incorrect here, and I'll explain why. It's IPTW, the charge party, the party against whom the unfair labor practice charges were filed. It is IPTW, if it could, that would assert a limited defense of work preservation. Work preservation is a defense to a charge under 8B4D. According to the Board, this is not IPTW never performed the work. It never performed the work under its contract prior to 2000, according to the Board's decision. The first time that IPTW performed this disputed work was at the ARCO refinery job site in the year 2000. Therefore, IPTW's threat to take economic action so that it would maintain the work assigned to it by RECON could not possibly be work preservation, because according to the Board, IPTW had never, never performed this work. So what was the objective of IPTW in making that economic threat? Its objective could only be, as the Board characterized in other cases, work acquisition. And in Airborne Express, the Board specifically said that the Safeway Rule, the rule that announced the work preservation doctrine, cannot be applied to a situation where a union, the charged party, has never performed the work. Now, wasn't that a fact and dispute? I mean, was that a factual dispute before? It was, and what I'm suggesting, Judge Wardlaw, is that this Court need not go beyond the findings of the Board. I'm accepting the findings of the Board. The Board found that IPTW had never performed the work prior to the year 2000. That's the Board's finding. Therefore, the interpretation of that finding becomes an issue of law. And under the Safeway Doctrine, as announced in Airborne Express, IPTW could never be deemed to have sought work preservation. Rather, it was seeking to acquire work. And if it's seeking to acquire work, that is a prescribed objective under AB4D. So IPTW has engaged in an economic threat for a prescribed objective, and therefore it is indisputable that my client, IPTW, has committed acts which constitute a reasonable cause to believe that there's a violation of AB4D. Remember, that's the standard that the Board must apply. Was there a reasonable cause to believe that there was a violation? According to the Board's finding and according to the application of Safeway, there has to be that conclusion. What happens next? Under the statutory scheme, when there is a finding of reasonable cause to believe a violation of AB4D, the Board sends the case, the dispute, to what we call in our field a Section 10K hearing, a hearing in which the Board takes evidence about what happened and then applies the various factors that the Board applies, and it makes an award of the work. In this case, it would award the work to the bricklayers on behalf of its members or to IPTW on behalf of its members. But the Board abdicated its responsibility here. The Board simply said this is work preservation. Now, no doubt the bricklayers were seeking to preserve the work. According to the record, the bricklayers had performed this work since the inception of Recon, since 1990. For the prior 10 years. But the bricklayers filed the charge against IPTW. The bricklayers are not the charged party. So the so we're not talking about conduct of the bricklayers. The Board must look at the conduct of the charged party. And therefore, the evidence is undisputable. Roberts. When does the employer's action fit within your analysis? I'm sorry? How does the employer's conduct fit within your analysis? In every case such as this, you have competing unions. One union claims that it is entitled to the work either under contract or historical trade jurisdiction, and another union claims it's entitled to the work. Every one of these 10 cases, every one that's cited, they all seek that. Here, what happened, as Mr. Lenz was explaining, the contract expired. That contract with the bricklayers expired. So what's Recon to do? It has two choices. Three, really. It can remain nonunion and do the work nonunion. Probably not a very tenable position given this kind of work in a major refinery. It could negotiate another contract with the bricklayers, or it could say, I don't want to be bothered with the bricklayers. Their rate's too expensive. They didn't give me any kind of accommodation that I needed economically. I'll find a different union that's willing to do the work and is able to do the work. Well, Recon already had a contract with IPTW. We could argue about whether it covered the disputed work. The Board says it didn't. But at this point in time for the refinery, the ARCO refinery, Recon said, look, I don't have a contract anymore with the bricklayers. IPTW, I want your members to do the work. Yeah, Recon's contract with you said that your union would do work at Recon's discretion. So basically you didn't have the scope of work that was the same or contained the same scope as in the other contract, the bricklayers' contract? Incorrect. That's the Board's and the bricklayers' argument. That's factually in error? That is absolutely factually in error. Can you point me in the record what IPTW's scope of work clause was? Sure. In the scope of the work portion of the IPTW contract, it says that the contract applies to all the renovation, construction and maintenance of work done by Recon. In another provision of the contract, it talks about which workers shall perform that work, and that's what the Board and the bricklayers have taken off on. That provision, Article, I believe it is 9, says that Recon can decide whether it's the laborer's classification, the laborer foreman classification or the craftsman classification, because there are three classifications in the IPTW contract. Recon decides who does the work. That would be like saying, all right, we have three judges. They all are going to do this work, but someone decides which judge is going to do the work. You know, I'm kind of puzzled. I think Judge Pius's question signaled this, too. The crux of the Board's ruling was that this so-called jurisdictional dispute was created by the employer, because he didn't want to pay the higher rates to the bricklayers, and they wouldn't accommodate. So he went out and he found someone else to do a portion of that work that they actually could do. So neither one of you has addressed this. I mean, how can you — someone needs to sit here and argue that Recon was the hapless victim of this circumstance. Well, that's exactly what happened. What Ms. Schillen said is exactly what happened. When that contract with the bricklayers expired, and what I just said a moment ago, Recon applied the IPTW contract to the ARCO job. It wasn't under any obligation, any contractual obligation with the bricklayers at that time, even though historically the bricklayers had done the work. IPTW then took over and did the work. Now, a month later, for its own reasons, Recon signed another contract with the bricklayers. Now it's in effect signed two contracts. Now it's created the dispute. Now it's got two contracts. So doesn't it bear some responsibility for creating this dispute? In every — almost every one of these cases, there are contractual contentions by both unions, because every one of these 10-K hearings, these jurisdictional dispute hearings, are like a triangle. You have an employer at the top, you have two unions over here, and they're all fighting, and there's always two contracts. There's almost always, when you look at like the labor — like a laborer's contract and an operating engineer's contract, there's always a dispute about how those contracts apply to specific work. And each union contends that its contract covers the work. The employer says, I'm caught in the middle. One's threatening to strike. One's threatening to picket. So charges are filed with the labor board under 8B4D, and then the 10-K case. But here the board seems to — you know, the board's finding is that Recon created this mess. The — well, of course that to have two contracts, one with the bricklayers and one with IPTW, Recon had to voluntarily enter in those contracts. But in answer to Judge Wardlaw's question, what I'm saying is, in every one of these construction cases, there are always contracts, whether it's the painter — Go ahead. Well, I mean, whether it's the blazers and the ironworkers talking about the installation of glass, whether it's the carpenters and the operating engineers talking about specific work, there are almost always both unions have contracts with the employer asserting that their contract covers the work. We're obligated to apply — you know, our standard review is substantial evidence. Does substantial evidence support the board's finding? Correct, on the finding. And what I'm saying — what I'm saying — So you're — so you're accepting the finding — you're willing to accept the board's finding that Recon created this situation? Well, when you say — when the Court says created, of course it created it. Or instigated. Literally. Let's change the word. Well, created in the literal sense — How about instigated? — that Judge Piazza — literally it did in the sense that it executed contracts with two different unions. But what — but what I'm saying is, that happens in every one of the cases. That shouldn't make any difference here. No, it shouldn't. It should not make any difference. No, because in all these 10K cases, there are contracts with two separate unions that caused the fight. And this is not unique. And the work preservation defense that the board characterizes is about is not what IPTW did. IPTW tried to acquire the work and was successful. All right. So you're over time now. Thank you. And I'm sorry. And we'll just reserve whatever's left for Mr. Lansing. I don't think you have any time left. You're over your time. Oh, I apologize. Thank you. Good morning, Your Honors. My name is Eric Moskowitz. May it please the Court. I think that it's important to recognize that, contrary to what Recon argued in its brief, that the board is not obligated to decide every AP4D case and to award the work. I think that the cases cited in our brief from this circuit and the D.C. circuit make clear that the board's obligation is at the initiation of the 10K proceeding to determine whether the dispute is something which really is an employer-cooked in the middle or what the fundamental beginning of the dispute was, whether, as in this case, the board found that it was the doing of the employer to create this problem. Let me make clear that the board is not saying that an employer is not allowed to have a preference between unions or that a company is not allowed to get into a situation where it is signed two contracts and the board is not going to decide the dispute. I think, for me, one of the simplest ways to look at this case has prompted me, again, to think about it the way this Court has asked, about the hiatus. In the initial stage of this proceeding, or the history of this case, Recon had a contract with the bricklayers and a contract with IPTW. It is the board's position, we think supported by more than substantial evidence here, that Recon was assigning the disputed work, the skilled application of the refractory materials to the bricklayers during that time, and that's precisely why Recon needed a break in the price, because it was the bricklayers performing the work. At that period of time, if both unions had taken the position, this work is mine, and one of them had struck or had picketed for the work, we would be much closer to the facts of most of the other 10k cases where the employer is caught in the middle, even though maybe the employer could have avoided it by signing the two contracts, but they signed the two contracts, now they're caught in the middle. That's not when the dispute arose in this case. Nor did the dispute arise in this case during the hiatus when the bricklayers' contract was no longer in place, and as Recon has argued, what's a poor boy to do? They needed the work to be performed, and they found they actually say they pursued other unions and found the IPTW to perform the work at the ARCO job. Ginsburg. Did they already have a contract with IPTW at that point? They had a contract with IPTW going back to the mid-'90s. The difference of the change that happened to the IPTW contract was in the geographic places where the contract was going to be applied, in addendum A. During most of the 90s, there was only one or two, I think perhaps only one job site that might have been listed in addendum A. Sometime in November, and it's not exactly clear when, in 1999, the locations where the IPTW contract were going to be applied, where IPTW people would be employed by Recon, was enlarged. But the other terms of the IPTW, given Recon, what the Board finds is essentially unrestricted option to reserve the work to give it to somebody else in the management rights clause and in the work assignment provision. Those stayed the same. Those contract provisions did not change. The crux of this dispute happens when, after the contract expired, Recon signs up the contract again with the bricklayers. At that point, Recon is obliging itself again to comply with the bricklayers' contract, and not surprisingly, when the bricklayers later found out that sometime apparently in January, the laborers started performing the work that had traditionally been the bricklayers and was the bricklayers' work under the old contract and the new contract, that they would have filed a grievance and pursued their contract rights. The company and IPTW make a very big deal about the fact that the charge in this case is filed against IPTW. And I would remind the Court that while this is true, the charge was filed against IPTW and the Board did focus its attention in the derivation of the dispute on the conduct of the employer and the conduct of the employer ultimately in relationship to the bricklayers' contract. That was exactly what happened in Wesco, in the Safeway case, where Safeway subcontracted the work to another employer that employed another that had a different union representing its employees. It was the union that was getting the work that actually engaged in the conduct that was alleged to be violative of AP4D. And the Board, with the approval of this Court, nonetheless focused on what did the employer do or not do to cause this dispute to exist. And the Board in this case found that the case is analogous. It's not exactly the same. Surely there is an ability in the construction industry for employers to sign two different contracts. But here the employer went out of its way to divest itself of one union and to give the work to another union. And this is what the Board is saying was the derivation of this dispute. This employer created the problem, and the Board is not obligated to treat it like every other AP4D. I might point out to the Court that the D.C. Circuit cases, there are a host of ILW cases cited in our brief, and there's a Second Circuit case, McLeod v. NMU. These cases are interesting because the Board does know how to say this is not work preservation, this is a work assignment dispute, and we will decide it. There are two or three ILW cases where the Board was asked to decide, asked to find this is work preservation, please don't decide this dispute. Don't award the work to one or the other. This is work preservation. It's not a work assignment dispute. What if during that hiatus period the work had been assigned to APTW? Let's assume it was. During the hiatus period, if that was the end of the story, I don't think we would be here. I don't think we'd be here for two reasons. Number one, the bricklayers might, the Board might find that the bricklayers divested itself of its contractual rights. But, in fact, I don't think we'd be here because factually the bricklayers would then, if that was the end of the story, wouldn't have said we're breaching our contract because there would have been no contract to breach. The Board and the parties are not focusing on the hiatus period, actually, until their reply briefs and this oral argument. But the real focus of the time is when bricklayers again had the right to claim this work, which it had done for years in the past, had a contract right to do for years in the past, when RECON signed up again without changing a word of the work assignment provision of the new contract. And at that point, bricklayers said, okay, it's ours now again. And the Board's position is that before and after the hiatus, the IPTW contract still permitted RECON to escape the IPTW, the laborers, and to reassign to the contract violation with IPTW. Let me just lastly say that in this case, the Board has not left the parties entirely without recourse. The, as I indicated at the tail end of our brief, the IPTW, excuse me, the bricklayers dispute is in court and it can be resolved under 301. This is what Congress intended 301 to do. And I ---- I'm sorry. That was confusing. The bricklayers have a dispute with RECON, a contractual dispute with RECON in the Federal District Court. They're saying that RECON did not assign our employees the work and should have, and so there's a damages lawsuit under 301. And there isn't ---- what I'm saying is that there is a venue for that dispute. I'm sorry. I didn't say at the outset of this argument, and Mr. DuMain will kill me, that I'm reserving six minutes for Mr. DuMain, who's representing the bricklayers. I have 11 minutes left, so I haven't gone into his time. So is he going to come up and speak? Yes. I guess I would just close by saying that the Board does think, does feel strongly that there is substantial evidence to support the conclusions that the bricklayers had traditionally done the work, even during the time when the two contracts were in play, during the late 90s, that the bricklayers' contract, of course, gave it the right to the work, that the hiatus is not at all controlling because, as this Court has recognized, they just ---- bricklayers and RECON signed up again, the contract giving the bricklayers the right to the work. Thank you, Your Honor. Thank you. May it please the Court. Jeffrey DuMain from Altshuler-Berzon, San Francisco, arguing on behalf of the Bricklayers Union. I just wanted to start out by making two very quick or three very quick or two very quick legal points in response to the argument before, and I have two other points to add. The first legal point that I'd like to make is to address Mr. Lenz's citation of the Nova Plumbing case. I want to make clear the Nova Plumbing case is a D.C. Circuit decision, if I recall, reversing the National Labor Relations Board. It has absolutely nothing to do with this case. It was a representation case, and the question that the NLRB and the Court of Appeals addressed was where you have a construction industry contract, how do you decide whether that's an 8F contract, a so-called pre-hire contract, or a 9A contract, a contract where the union represents the majority, has been authorized to represent the majority of the employees. It has nothing to do with the jurisdictional dispute. It has nothing to do with 10K, anything like that. It is merely a case about can you look to the language of the contract itself to determine whether it's 8F or 9A, or do you have to go beyond that into other evidence? Ginsburg. Would you explain what 8F is? Feigin. Sure. I'm sorry. Your Honor, under the National Labor Relations Act, with a couple of exceptions, a union can represent a bargaining unit only if it has the support of a majority of the members of that bargaining unit, usually determined through an NLRB election, but not always. The employer can voluntarily recognize the union as the majority representative if it's convinced that the union, through authorization cards or something else, actually represents a majority. The construction industry, there's a special rule called 8F. It's Section 8F of the Act. It's found at 29 U.S.C. 158F. And what that says is in the construction industry, a union can represent the bargaining unit without showing majority support. And the reason for that, the reason Congress created that special rule, was because of the cyclical nature of employment in the construction industry. Employers work job to job. After a job is over, they may lay off their employees or lay off some of their employees. The union runs a hiring hall and basically is a pool for skilled labor. In that situation, with the employee complement changing all the time, it's not always easy to determine the majority, and it allows the union to represent workers even if there is no majority, thereby giving the contractor a skilled labor pool that can sign a contract with the union to provide workers through the hiring hall. And then whenever it needs workers, when it has a job coming up, the union will send it workers. So NOVA plumbing has absolutely nothing to do with this case. The next point I'd like to make is that both Mr. Lenz and Mr. Rosen fundamentally, I think, grounded their position on the assertion that only the charged union, only the union that has engaged in this strike or picket or threat of picket, can raise a work preservation argument. And they've erected that as though it were a rule of law. But they've never cited a case that says that, and I can cite you two cases that say the opposite. The first one is the Board decision in USP Wesco, a decision that was affirmed by this Court. In that case, the noncharged union, the one that didn't threaten to picket or didn't picket and didn't strike or anything, raised the work preservation argument. And the Board found in its favor on the work preservation argument, and this Court affirmed. The other case that shows that I'm right is also, they're both cited in the briefs. The other case is a case called IAFSI, also Shepherd Exposition Services. IAFSI is International Alliance of, I forget what the acronym is, the Stage Employees, a very important union here in Los Angeles. In that case, the noncharged party raised a work preservation argument. The Board evaluated that argument and found as a point of fact that they had not done the work before, so it was not work preservation. But the Board did not say, you, the noncharged union, can't raise that argument because only the charged union can raise the argument. Quite the opposite. They assessed it on its merits and decided. So those two cases make absolutely clear that their fundamental argument, their fundamental legal argument is just wrong. Now, with my remaining time, I'd like to discuss why their fundamental factual argument is wrong. And their fundamental factual argument that they've asserted here in the argument here today is that, I think Mr. Rosen addressed this, they say that the Board was wrong in concluding that the IPTW agreement does not, IPTW, collective bargaining agreement does not require RECON to assign it any particular work. The question here is whether there's substantial evidence for the Board's conclusion, and there most certainly is. First, as one of the judges, I believe Judge Wardlaw, but it could have been Judge Paez, raised earlier, there is a specific provision in the IPTW contract that says that the, that the work assignments shall be entirely at the discretion of the company without regard to seniority or classification. Well, that is a specific work assignment provision that says work assignments shall be entirely at the discretion of the company. What RECON and the IPTW rely on is an earlier part of the contract that just says that it covers the construction, maintenance, and renovation operations of the company. The problem with that is that says what the contract covers. It's just a scope clause. It does not say what particular work must be assigned to the IPTW. That is the work assignment clause. That's a more specific clause. That, therefore, trumps this scope clause. And the other part of the contract you have to look at is the management rights clause, which is found in Article 22 of the IPTW contract. It is the broadest management rights clause I've ever seen in my years of practice. And it basically says that everything that the company could do before, it can still do. And it specifically cites job assignment as one of the things the company can still do unless there is a specific and express limitation in the contract to the contrary. So the point is there is no specific and express limitation on the job assignment. In fact, the only part of the contract that specifically addresses job assignment says the company can do whatever it wants. I'm running out of time, but I wanted to cite a little more evidence that provides substantial evidence for the Board's conclusion that the IPTW contract did not require RECON to assign it any particular work. And the most telling evidence is it sort of follows the old adage that the proof of the pudding is in the tasting. If the IPTW contract had required RECON to give all of the disputed work to the IPTW, then why wasn't RECON doing that at the U.S. Borax job in 1996? It worked at U.S. Borax from 1996 to 1999. That was the only job that was covered by the IPTW contract. If that contract required the employer, required RECON to assign all of the skilled work to the IPTW, why wasn't it doing that at U.S. Borax? The evidence is absolutely clear in the record that, in fact, at U.S. Borax from 1996 to 1999, the employer assigned all of the skilled work that's here in dispute to RECON, to the bricklayers. The only work at Borax that was assigned to the IPTW was the non-skilled work that's not in dispute here. Not only did RECON not assign that work to the IPTW and assign it to the BAC, the IPTW never did anything. It never filed a grievance. It never took any action. If the work really belonged to it under the contract, it would have done that. The second piece of telling evidence in this regard is the fact that even after this dispute arose, there is evidence in the record, specific evidence from Mr. Bellamy of RECON, saying that if the jobs after which the dispute arose, the employer assigned much of the skilled work to the IPTW, but always assigned the actual bricklaying, the putting in of bricks, to the bricklayers. And when asked why he assigned some work to RECON and some work to the IPTW and some work to the bricklayers, he talked about things like skills and wage level. He never said he assigned skilled work to the IPTW because their contract requires me to do so. And, in fact, in his testimony at the 10-K hearing, he says under their contract they'll do whatever we deem they should do. That was his testimony. And so if the IPTW contract required him to assign to the IPTW all of its construction, if that really meant it had to assign all of it, how come he assigned the bricklaying to the bricklayers? His argument proves too much when they say the contract requires us to assign everything to the IPTW. And I'm running out of time. I have 49 seconds, so the last thing I'd like to say is one more piece of evidence. In the record, and this is unrebutted in the record, Mr. Bellamy in November of this year, November 1999, told bricklayer Mauro Romanelli, who testified in this proceeding and was unrebutted by Mr. Bellamy, that he was going to sign up workers to another union that was claiming the bricklayers' work and that he wanted it to go to a jurisdictional dispute. Mr. Bellamy said this was a tool to get the BAC to lower its wage rate, and then this is the crucial part. He said, regarding the reassignment of work, he could break it off at any time. Well, if he could break it off at any time, then the IPTW does not have a contractual claim for that work. If he can break it off at any time, there is nothing in the IPTW contract that says he has to assign it to them. All right. Thank you, counsel. Thank you very much. We're out of time. This case, Recon, Refractory and Construction v. NLRB, is submitted, and this session of court is adjourned. All rise. The court of this session stands adjourned. Thank you, counsel. Thank you, counsel. Thank you, counsel.
judges: Hall, Wardlaw, Paez